AO 109 (Rev. 11/13) Warrant to Seize Property Subject to Forfeiture

# United States District Court
for the
District of Arizona

SEALED

| | | |
|---|---|---|
| In the Matter of the Seizure of:<br><br>One 2022 Rolls Royce Cullinan, VIN SLATV8C03NU210379, Arizona License Plate Number AZA82M. | ) | Case No. 26-5434MB |

## WARRANT TO SEIZE PROPERTY SUBJECT TO FORFEITURE

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests that certain property located in the District of Arizona be seized as being subject to forfeiture to the United States of America. The property is described as follows:

One 2022 Rolls Royce Cullinan, VIN SLATV8C03NU210379, Arizona License Plate Number AZA82M.

I find that the affidavit(s) and any recorded testimony establish probable cause to seize the property.

**YOU ARE COMMANDED** to execute this warrant and seize the property on or before 9/24/26
*(not to exceed 14 days)*

☒ in daytime - 6:00 a.m. to 10:00 p.m. ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must also give a copy of the warrant and receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

An officer present during the execution of the warrant must prepare, as required by law, an inventory of any property seized and the officer executing the warrant must promptly return this warrant and a copy of the inventory to any United States Judge on criminal duty in Arizona.

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be search or seized *(check the appropriate box)*

☐ for ___ days *(not to exceed 30)*. ☐ until the facts justifying, the later specific date of ___________

Date and time issued: September 10, 2026 @ 2:10 p.m. [signature]
*Judge's signature*

City and State: Phoenix, Arizona — Honorable Deborah M. Fine, U.S. Magistrate Judge
*Printed name and title*

AO 108 (Rev. 06/09) Application for a Warrant to Seize Personal Property Subject to Forfeiture

# United States District Court
for the
District of Arizona

SEALED

In the Matter of the Seizure of:

One 2022 Rolls Royce Cullinan, VIN SLATV8C03NU210379, Arizona License Plate Number AZA82M.

Case No. 26-5434MB

## APPLICATION FOR A WARRANT TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe the following property in the District of Arizona or elsewhere is (a) property, real or personal, which constitutes or is derived from proceeds traceable to a Federal health care offense, including but not limited to 18 U.S.C. § 1347 (Health Care Fraud), or property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1957 (Money Laundering); (b) subject to seizure pursuant to 18 U.S.C. §§ 981(b) and 982(b)(1), and 21 U.S.C. § 853(e) and (f); and (c) subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C), and 982(a)(1) and (7), and 28 U.S.C. § 2461. *(describe the property):*

One 2022 Rolls Royce Cullinan, VIN SLATV8C03NU210379, Arizona License Plate Number AZA82M.

The application is based on these facts:

See Affidavit of Homeland Security Investigations Special Agent Jesus Goodman.

❑ Continued on the attached sheet.

Digitally signed by JESUS GOODMAN
Date: 2026.09.10 08:38:42 -07'00'

*Applicant's signature*

Jesus Goodman, Special Agent, Affiant
*Printed name and title*

Approved by AUSA Aron Ketchel
Digitally signed by ARON KETCHEL
Date: 2026.09.10 07:02:20 -07'00'

Sworn to telephonically and signed digitally.

Date: September 10, 2026 @ 2:10 p.m.

*Judge's signature*

City and State: Phoenix, Arizona

Honorable Deborah M. Fine, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH AND SEIZURE WARRANTS

I, Jesus Goodman, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION

1. I make this affidavit in support of applications for multiple search and seizure warrants. Specifically, this affidavit is made in support of the following:

a. Under Rule 41 of the Federal Rule of Criminal Procedure for a warrant to search the premises located at 6744 W. Glendale Ave., Suite 160, Glendale, Arizona 85303 ("**Subject Premises 1**"), as further described in **Attachment A-1**;

b. Under Rule 41 of the Federal Rule of Criminal Procedure for a warrant to search the premises located at 7979 W. Expedition Way, Peoria, Arizona 85383 ("**Subject Premises 2**"), as further described in **Attachment A-2** for, among other items:

   i. A cellphone known to be directly associated to Maurice Williams, with assigned phone number (602) 561-9552 (the **"-9552 Number"**)

   ii. A 2022 Rolls Royce Cullinan, Vehicle Identification Number SLATV8C03NU210379, Arizona License Plate Number "AZA82M" (the **"2022 Rolls Royce"**); vehicle is subject to seizure and listed below.

c. Under Rule 41 of the Federal Rule of Criminal Procedure for a warrant to search the person named Maurice Marcell Williams, as further described in **Attachment A-3**.

d. Under 18 U.S.C. § 18 U.S.C. §§ 981(b) and 982(b)(1), and 21 U.S.C. § 853(f), for a warrant to seize property subject to criminal and civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) and (C), and 18 U.S.C. § 982(a)(1) and (7), including the following:

i. Wells Fargo Advisors brokerage account number 6583-9922 in the name of Maurice Williams (the "**WFA -9922 Account**");

ii. Wells Fargo Advisors brokerage account number 4389-1578 in the name of Thinking Learning Together 2 LLC (the "**WFA -1578 Account**"); and

iii. 2022 Rolls Royce Cullinan, Vehicle Identification Number SLATV8C03NU210379, Arizona License Plate Number "AZA82M" (the **"2022 Rolls Royce"**)

2. The locations to be searched are specifically described in Attachments A-1 and A-2, as well as the person described in Attachment A-3, and the lists of items to be seized are set forth in Attachments B-1, B-2, and B-3. Specifically, Attachment B-1 corresponds to Attachment A-1, Attachment B-2 corresponds to Attachment A-2, and Attachment B-3 corresponds to Attachment A-3. Attachments A-1, A-2, A-3, B-1, B-2, and B-3 are all incorporated herein by reference.

3. The warrants seek authority to seize evidence, fruits, and instrumentalities of criminal violations including of 18 U.S.C. § 1347 (Healthcare Fraud) and 18 U.S.C. § 1957 (Monetary Transactions) (collectively, the "Subject Offenses").

4. The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement agents/officers, investigators, Arizona state officials, and witnesses. This Affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all my knowledge about this matter.

## AGENT BACKGROUND

5. I am a Special Agent with Homeland Security Investigations ("HSI"), and a federal law enforcement officer within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C). I am authorized by Rule 41(a) to submit an application for a search and seizure warrant. I have been employed as a federal law enforcement agent since December 2001,

including over sixteen years as a Special Agent with HSI. As a Special Agent, my duties and responsibilities include conducting criminal investigations of individuals and business entities that have allegedly violated criminal statutes related to immigration, narcotics, conspiracy, wire fraud, bank fraud, health care fraud, money laundering, and other crimes committed against the United States. In my capacity as a Special Agent, I have reviewed, analyzed, and identified documentation evidencing the substantial profits/income generated by individuals from a variety of illegal sources, and their attempt to hide and conceal the illegal activity and related profits. I have participated in the execution of numerous search warrants and seizure warrants during my investigations of alleged violations of these laws.

6. Throughout my sixteen years as a Special Agent with HSI, I have had frequent communications with federal prosecutors regarding the identification of legal issues involved in investigations of violations of immigration, conspiracy, wire fraud, health care fraud, and money laundering statutes. Concerning the facts of this investigation, for almost three years, I have worked with federal prosecutors, Special Agents with the Internal Revenue Service, Criminal Investigation Division ("IRS-CI"), and Arizona state officials, to investigate healthcare fraud associated with Arizona's Medicaid program, the Arizona Health Care Cost Containment System ("AHCCCS").

## BACKGROUND ON MONEY LAUNDERING

7. Based on my training, experience, and participation in this investigation and other money laundering investigations, I am aware that:

a. the flow of funds into and out of a company can be interpreted and compiled by tracing the paper trail which is created by entries into business records and by the documents received or prepared to support a transaction;

b. individuals who commit healthcare fraud, wire fraud, and money laundering often utilize bank accounts to conduct business;

c. individuals who commit healthcare fraud, wire fraud, and money laundering often utilize the internet, email, and other electronic modes of communications to carry out these crimes, communicate with clients, co-conspirators, customers, and financial institutions; and

d. individuals or businesses involved in healthcare fraud, wire fraud, and money laundering often purchase vehicles, real estate, and other investments, with the earnings from illegal activity. They also frequently utilize email and internet to transfer funds and monitor their bank account activity.

## BACKGROUND ON AHCCCS

8. I learned the following information about AHCCCS, partly from reading information posted on AHCCCS's publicly available website (www.azahcccs.gov), which describes how AHCCCS administers Arizona's state health insurance plans and the application process for AHCCCS providers. I have also consulted with AHCCCS Office of Inspector General ("AHCCCS-OIG") Deputy Inspector General Julie Culton, and she has provided information regarding AHCCCS as described below.

9. AHCCCS is Arizona's Medicaid agency that offers health care programs to serve Arizona residents. AHCCCS contracts with several health plans to provide covered services and works like a Health Maintenance Organization ("HMO"). AHCCCS works with medical providers such as doctors, hospitals, pharmacies, specialists, and counselors, to provide care for AHCCCS members (beneficiaries). Covered services include, among other services, behavioral health counseling services, including counseling, consultation, assessment and specialized testing, as well as substance abuse treatment.

10. All medical providers who serve AHCCCS members are required to be screened and enrolled as an approved provider before AHCCCS pays the provider for medical services provided to AHCCCS members. For a medical professional to become a provider in the AHCCCS program, the provider must truthfully and accurately complete a provider enrollment paperwork package and submit it to AHCCCS. Reviewing officials at

AHCCCS review such applications and, if they approve the application, the medical provider is then permitted to begin providing medical services to AHCCCS members and receive payments from AHCCCS for medical services rendered.

11. The provider applications are revised year by year. Generally, however, during the relevant time period, the provider application, in pertinent part, required potential medical providers to truthfully report who had a direct or indirect ownership interest in the applicant's business. The provider applications also inquired about the criminal history for the provider's owners and managing employees.

12. Approved AHCCCS medical providers typically submit claims for payment for medical services provided to AHCCCS members using the "AHCCCS Online Provider Portal" ("Provider Portal") located at https://azweb.statemedicaid.us/Account. Providers must set up a username, password, and register as a provider through the Provider Portal. After successfully registering as a new provider on the Provider Portal, the provider must then enter a unique username and password assigned to access the Provider Portal. Providers can use the Provider Portal to check whether a potential patient is enrolled and eligible for AHCCCS coverage.

13. Pursuant to 42 U.S.C. § 1320a-7, the United States Department of Health and Human Services Office of Inspector General ("HHS-OIG") has the authority to exclude individuals and entities from federally funded health care programs for a variety of reasons, including a previous conviction for fraud. Those individuals that are excluded cannot receive any payment from healthcare programs for any items or services they furnish, order, or prescribe. This includes those that provide health benefits funded directly or indirectly by the United States. AHCCCS is funded directly with funds provided by the United States.

14. HHS-OIG maintains a list of all currently excluded individuals and entities called the List of Excluded Individuals/Entities ("LEIE"), which healthcare providers may search on HHS-OIG's website located at www.oig.hhs.gov/exclusions. Anyone who hires an individual or entity on the LEIE may be subject to civil monetary penalties. To avoid

such penalties, health care entities should routinely check the list to ensure that new hires and current employees are not on it.

15. Per the AHCCCS *'Provider Participation Agreement,'* and Arizona Revised Statute 12-2297(A)(1), approved AHCCCS medical providers have a six-year record retention requirement.

16. Based on my training and experience and the facts as set forth in this Affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1347 (Healthcare Fraud); and 18 U.S.C. § 1957 (Monetary Transactions) have been committed by **MAURICE MARCELL WILLIAMS ("WILLIAMS")** and his son, **MAURICE TAVON WILLIAMS ("M.T.WILLIAMS")**. There is also probable cause to search for records and other things as described in Attachments A-1, A-2, and A-3, for evidence of these crimes, and to seize property for forfeiture as described in Attachments B-1, B-2, and B-3.

## SUMMARY OF PROBABLE CAUSE

17. This investigation and the Indictment recently returned by the grand jury concerns fraud committed through AHCCCS provider Thinking Learning Together 2 ("TLT2"), which operated two outpatient behavioral health facilities in Arizona. The AHCCCS provider applications for these facilities named **M.T. WILLIAMS** as the owner and operator. As detailed throughout this affidavit, the evidence obtained to date demonstrates that **WILLIAMS** – not his son, **M.T. WILLIAMS** – was in fact the true owner of TLT2. The investigation has further revealed that **WILLIAMS** applied to be an AHCCCS provider by completing two provider applications on which he did not report his ownership interest and did not truthfully disclose his criminal history that includes a prior conviction involving thirteen felony counts. According to AHCCCS, if **WILLIAMS** had truthfully disclosed his ownership interest and felony convictions, the TLT2 applications would have been subject to additional scrutiny through a second-level review process. As a result, the applications may not have been approved, and AHCCCS may not have paid

any funds to those entities. In addition, after obtaining approval to operate TLT2, **WILLIAMS** and his associates submitted patient care forms to AHCCCS indicating that TLT2 provided counseling services to AHCCCS beneficiaries when it appears that no such services were actually provided or were falsely inflated. As a result of **WILLIAMS's** failure to disclose his felony conviction to AHCCCS, and the submission of false patient treatment forms, it appears **WILLIAMS** received and deposited payments from AHCCCS totaling approximately $19,735,968.74 between August 1, 2022, and July 13, 2023.

18. On or about June 1, 2023, AHCCCS suspended TLT2 when it discovered **WILLIAMS's** failure to disclose his criminal history on TLT2's provider applications. On or about August 31, 2023, an informal settlement conference was held at which **WILLIAMS** appeared before AHCCCS-OIG employees while represented by legal counsel. During the informal settlement conference, **WILLIAMS's** attorney asserted that **WILLIAMS** had no ownership interest in TLT and argued the true owner was his son, **M.T. WILLIAMS,** who did not have a criminal history. After the informal settlement conference, AHCCCS-OIG temporarily rescinded the suspension pending further review of evidence. On or about December 8, 2023, a State Fair Hearing was held in front of an Administrative Law Judge (ALJ) between AHCCCS and TLT2 and its legal counsel. The purpose of the State Fair Hearing was to determine if the imposition of a temporary, system-wide suspension of payments pending an investigation into a credible allegation of fraud, as provided for in 42 C.F.R. § 455.23, was appropriate. At the State Fair Hearing, AHCCCS-OIG Deputy Inspector General Julie Culton testified on AHCCCS's behalf. Following Julie Culton's testimony, the Respondents made the decision to rest their case without putting on a case. On December 12, 2023, a Notice of Termination of Provider Participation Agreement (PPA) Letter was sent to TLT2 (ID 124406), reinstating an immediate termination of the PPA based on records proving **WILLIAMS** was the owner, and who had a felony conviction that was not disclosed on original AHCCCS applications. On December 28, 2023, the ALJ's decision was provided to AHCCCS. Per the ALJ: Based

on the foregoing, it is recommended that AHCCCS's suspension of payment action against Respondent remain in effect pursuant to 42 C.F.R. § 455.23.

19. On September 8, 2026, a federal grand jury in the District of Arizona returned a sealed, 11-count Indictment, (CR 26-1055-PHX-JJT), charging **WILLIAMS** with a single count of healthcare fraud, in violation of 18 U.S.C. § 1347, and ten counts of transactional money laundering, in violation of 18 U.S.C. § 1957. The indictment alleges that **WILLIAMS** engaged in fraud by omitting **WILLIAMS's** role as the true owner of TLT2 when it applied to be an AHCCCS provider for two behavioral outpatient centers. The Indictment also contains forfeiture allegations for the real properties currently owned by **WILLIAMS** and **M.T. WILLIAMS**, which are described below. The government sought a limited indictment at this stage in the investigation because the government's investigation is currently covert and the government is concerned that taking further, overt investigatory steps would jeopardize the government's ability to seize valuable assets that appear to be proceeds of **WILLIAMS** and **M.T. WILLIAMS's** fraudulent activity. Based upon evidence developed from additional investigative steps (including without limitation interviewing co-conspirators and purported beneficiaries), as well as evidence developed following the execution of the requested warrants, the government may pursue a superseding indictment with additional charges.

## HOW WILLIAMS FIRST CAME TO THE ATTENTION OF LAW ENFORCEMENT

20. AHCCCS-OIG received multiple referrals on **WILLIAMS** and TLT2, indicating they were engaging in fraudulent billing. The first referral was received on or about April 24, 2023, from the AHCCCS Division of Fee-For-Service Management ("DFSM") Audit Team, regarding billing issues when it advised: "Provider is charging excessively for services or supplies H0015. The provider has been paid over $12 million for only billing this one service exclusively to AIHP." The AIHP reference is for the American Indian Health Program ("AIHP").

21. A second referral was received on or about April 26, 2023, from Susan Hoglund, Special Investigations Sergeant with the State of Arizona's Department of Economic Security Office of Inspector General. In her referral to AHCCCS-OIG, Susan Hoglund informed that while she was serving a search warrant in one of her investigations, they found 19 firearms and 5 pounds of premium marijuana. A.W., a felon, claimed responsibility for the weapons and pot found during the search. Also found during their search was a check made payable to A.W. in the amount of $5,800 from TLT2, and the check's memo line noted the words "payroll Feb 13-17." The check appears to have been signed by **WILLIAMS**. Susan Hoglund further advised she obtained a TLT2 Bank of America checking account statement for the month of February 2023 that documented the account had a balance of $4,000,000.

22. Susan Hoglund also contacted investigators, sharing the above-mentioned information she originally provided to AHCCCS-OIG, resulting in HSI and IRS-CI initiating the investigation into TLT2, **WILLIAMS**, and **M.T. WILLIAMS**.

## WILLIAMS'S FELONY CONVICTIONS

23. I have reviewed certified records of the Superior Court of Arizona pertaining to **WILLIAMS's** felony convictions. A review of these records indicates **WILLIAMS** was convicted of thirteen felony counts on May 16, 2003, as described in the Court's record pertaining to case number: CR2000-001456-M; **WILLIAMS** was convicted of the following felonies:

- **i.** Count 1: Illegal Control of Enterprise, a felony;
- **ii.** Count 2: Conspiracy Marijuana, a felony;
- **iii.** Counts 21, 23, 25, 27, 29, 31, 33, 47 and 49: Transport for sale, Sale or Transfer of Marijuana, a felony;
- **iv.** Count 52: Possession of Marijuana, a felony; and
- **v.** Count 53: Misconduct Involving Weapons, a felony.

24. I have also reviewed certified records **WILLIAMS** submitted to the Superior Court of Arizona in his attempt to have his felony conviction set aside. On or about October 4, 2021, **WILLIAMS** submitted to the Superior Court of Arizona an Application To Restore Civil Rights, Restore Gun Rights, and Set Aside Judgement of Guilt. The application, dated October 4, 2021, contains what appears to be **WILLIAMS's** signature, and **WILLIAMS** reported his phone number to be the **-9552 Number**, and email contact mtmwilliams@XXXXXX.com[1] (the "Williams Email"). On the application, **WILLIAMS** completed information acknowledging his felony convictions and indicated he completed probation on March 31, 2011.

25. On or about May 18, 2022, the Superior Court of Arizona denied **WILLIAMS** request to Set Aside Judgement of Guilt, Restore Civil Rights, and restore his right to possess or own a firearm. The Court denied **WILLIAMS's** request, in part, because **WILLIAMS** had not met all the statutory requirements for setting the conviction aside, and noted that **WILLIAMS** still owes the State of Arizona a significant amount of mandatory fines and fees related to his felony convictions. A Criminal Financial Obligations Worksheet indicated that **WILLIAMS** owes the State of Arizona an outstanding grand total of $2,159,447 in unpaid fines related to his felony conviction. As a result of this Court ruling, **WILLIAMS's** felony convictions remained on his record.

## WILLIAMS INCORPORATES TLT BUSINESSES IN STATE OF ARIZONA

26. Investigators have reviewed Arizona Corporation Commission ("ACC") documents which show **WILLIAMS** is reported to be the statutory agent and member for

---

[1] Email provider records for this email address (the Williams Email), are directly tied to **WILLIAMS**. As detailed in this affidavit, the Williams Email has only been associated with **WILLIAMS**, and not **M.T. WILLIAMS.** This includes **WILLIAMS's** application to set aside his conviction and restore his rights, his ADHS licensing application, bank accounts that received proceeds from the crimes, as well as other documents.

the two active businesses listed below. Also included, are the dates on which they were formed/registered with the ACC.

a. Thinking Learning Together, LLC ("TLT"), 05/21/2015[2]
b. Thinking Learning Together 2, LLC ("TLT2"), 02/06/2022

27. TLT2 was organized by **WILLIAMS** on February 6, 2022, and once again, **WILLIAMS** used the **Subject Premises 1** address at the time of organization. The Articles of Organization lists the Williams Email as the contact email for the company. The type of business was listed as "Health Care and Social Assistance." On or about June 1, 2023, AHCCCS suspended TLT2 by issuing a Credible Allegation of Fraud (CAF) when AHCCCS discovered **WILLIAMS** failed to disclose his felony convictions on the criminal history sections of both of TLT2's provider applications. On or about July 11, 2023, an amendment was filed to TLT2's Articles of Organization which added **M.T. WILLIAMS** as a member of TLT2. The address listed for **M.T. WILLIAMS** was 18032 West North Lane, Waddell, Arizona 85355 (the "Waddell Address"), which is subject to a forfeiture allegation in the Indictment. Investigators have searched available public records and law enforcement criminal history databases, and did not find any felony convictions or criminal history for **M.T. WILLIAMS**. Based on my training and experience and investigation to date, the Affiant believes **WILLIAMS** added his son as a member of TLT2 to conceal his ownership interest after AHCCCS issued their CAF on June 1, 2023.

## <u>WILLIAMS SUBMITS LICENSE APPLICATIONS WITH ARIZONA DEPARTMENT OF HEALTH SERVICES & AHCCCS</u>

### APPLICATIONS FOR FIRST LOCATION AT 5950 W. MCDOWELL RD

28. On or about April 28, 2022, **WILLIAMS** submitted an "Initial License Application for a Health Care Institution," to the Arizona Department of Health Services ("ADHS"). The license was submitted in the name of TLT2 to provide outpatient

---

[2] It appears that all fraudulent billing at issue in this investigation was done under the TLT 2 entity and references to the initial TLT entity are provided solely for context.

counseling services treatments at 5950 W. McDowell Rd., Suite 106, Phoenix, Arizona 85035. The application listed **WILLIAMS** as the CEO of TLT2, Jasmine Ward ("Ward") as the individual who accepts service of process and subpoenas, and listed the Chief Administrative Officer as Dr. Joseph Kjoroge, with a phone number ending in 1807 and an email address of JNJNKIMANI67@XXXXXX.com (the "Kimani Email"). The application appeared to be signed by **WILLIAMS** and listed the owner's phone number as the **-9552 Number**, and the Williams Email. The health care institution section of the application listed the email TLTBEHAVIORALHEALTH@XXXXXX.com (the "TLT Email"). Investigators have reviewed and compared **WILLIAMS's** signature on this "Initial License Application for a Health Care Institution" application to **WILLIAMS's** known signature placed on other legal documents. There were strong indications that **WILLIAMS** signed the "Initial License Application for a Health Care Institution". The signature **WILLIAMS** placed on his Application To Restore Civil Rights, Restore Gun Rights, and Set Aside Judgement of Guilt filed with Superior Court of Arizona dated October 7, 2021, appear to contain a similar signature to the one **WILLIAMS** placed on the "Initial License Application for a Health Care Institution." Additionally, when investigators compared the signature **WILLIAMS** placed on the "Initial License Application for a Health Care Institution" to signatures **WILLIAMS** placed on signature cards when opening personal and business checking accounts at Bank of America, the signatures appear similar. The mailing address for TLT2 was listed as **Subject Premises 1**.

29. A record check of the phone number ending in -1807 for Dr. Kjoroge revealed that it was associated to Joseph N. Kimani, with a Social Security Number (SSN) XXX-XX-1619. A record check of SSN XXX-XX-1619 revealed it belonged to Joseph Kjoroge Kimani ( "Kimani"), born in 1967.

30. On or about May 11, 2022, ADHS sent a letter to Kimani, along with license CSLG11682, which authorized TLT2 to operate as a behavioral health outpatient treatment center at 5950 W. McDowell Rd., Suite 106, Phoenix, Arizona 85035.

31. On or around May 11, 2022, **WILLIAMS** posted the following message and pictures on his public-facing Facebook page:




32. By posting this message to the public, **WILLIAMS** purports and holds himself out to be the owner/operator of TLT2. **WILLIAMS** finished the above post by referring to himself as "Dr. Williams." **WILLIAMS's** post received 150 comments, some of which included job solicitations, and other individuals soliciting information about the clinic.

33. As of August 1, 2026, **WILLIAMS's** Facebook profile lists him as the owner and CEO of "TLT Behavior Health." A records check with the ACC shows no entity incorporated under that name in Arizona. The ACC does, however, have an incorporation record for "TLT Behavioral Health LLC." The statutory agent and a listed member for that entity is Mariah Williams ("Mariah"), **WILLIAMS's** daughter. Shawn Gibbs, a known

associate of **WILLIAMS** and a Facebook "friend" of both **WILLIAMS** and Mariah, is also listed as a member of TLT Behavioral Health LLC. Below is a screenshot of **WILLIAMS's** public-facing Facebook profile.




As detailed throughout this affidavit, there are strong indications that **WILLIAMS** has a propensity to obscure the true ownership of businesses.

## <u>WILLIAMS SUBMITS LICENSE APPLICATION WITH AHCCCS</u>

34. On or about May 18, 2022 – about seven days after **WILLIAMS** made the above-mentioned Facebook post – the Maricopa County Superior Court of Arizona issued

an order denying **WILLIAMS's** Application To Restore Civil Rights, Restore Gun Rights, and Set Aside Judgement of Guilt.

35. Ten days later, on or around May 28, 2022, **WILLIAMS**, applied to AHCCCS – the State of Arizona's Medicaid agency – to become a behavioral health provider for members of the AHCCCS program. The employer tax identification number listed was 881075227, which is assigned to TLT2. The application contained **WILLIAMS's** known residential address at that time, the **-9552 Number**, the Williams Email, and listed Ward as a "managing employee." Although the ACC and the April ADHS initial license application indicated **WILLIAMS** was the organizer and CEO of TLT2, the AHCCCS application listed **M.T. WILLIAMS's** Social Security Number, XXX-XX-4000, as the 100 percent owner of the business. By using **M.T WILLIAMS's** means of identification, **WILLIAMS** avoided disclosing his felony convictions and was able to draw significantly less scrutiny by providing favorable responses to questions on the AHCCCS Provider Enrollment Application's ownership/controlling interest section. A sub-section of the ownership/controlling interest section titled, *'Owners Adverse Action,'* asks if any of the owners or managers, on or after August 21, 1996, were convicted of certain crimes. For question 1(a.), convicted of "A federal or state felony," the TLT2 application indicated that none of the responsive entities (which included anyone with a substantial financial interest) had a felony conviction. This is a material fact, as the facts laid out in this affidavit will continue to show that **WILLIAMS** – a convicted felon – was the beneficial and 100% owner of the AHCCCS payments to TLT2, and used **M.T. WILLIAMS's** Social Security Number on the AHCCCS application to obfuscate the true ownership of TLT2.

36. On both TLT2 AHCCCS Provider Enrollment Applications, **WILLIAMS** provided the **Subject Premises 1** address for correspondence. All AHCCCS checks made payable to the TLT2 were sent via the Unites States Postal Service to this address. According to AHCCCS and Arizona state law (Arizona Revised Statute 12-2297 – Retention of Records), TLT2 is required to retain health care provider records for a period of six years.

**APPLICATIONS FOR SECOND LOCATION AT 2837 N. 75TH AVE., GLENDALE, ARIZONA**

37. On or about July 27, 2022, another "Initial License Application for a Health Care Institution" was submitted to the ADHS. The license was again submitted in the name of TLT2 to provide outpatient counseling services at 2837 N. 75th Ave., Suite 5, Glendale, Arizona 85033. The application listed **WILLIAMS** as the CEO and the individual who accepts service of process and subpoenas for TLT2. The application also listed the Chief Administrative Officer as Kimani, with the same associated phone number and email reported for Kimani on the first TLT2 "Initial License Application for a Health Care Institution" submitted to ADHS. The application appeared to be signed by **WILLIAMS** and listed the owner's phone number as a number ending in 1999 (the "-1999 Number"), and also listed the TLT Email. Similar to as described above, investigators reviewed and compared the signature of **WILLIAMS** on the "Initial License Application for a Health Care Institution" with **WILLIAMS's** known signature on other legal documents. Based on this comparison, the investigators believe that **WILLIAMS** signed the "Initial License Application for a Health Care Institution." The mailing address for TLT2 was listed as **Subject Premises 1**.

38. On or about August 12, 2022, ADHS sent a letter to "Joseph Kimani" of TLT2, along with license OTC11881, which authorized TLT2 to operate as a behavioral health outpatient treatment center at 2837 N. 75th Avenue, Suite 5, Phoenix, Arizona 85033.

39. On or about August 11, 2022, another application was submitted to AHCCCS to become a provider for a second TLT2 location. The employer tax identification number listed was 883805146, which is assigned to TLT2. The application contained **WILLIAMS's** known residential address at that time, and listed Ward as a "managing employee." Although ACC and ADHS initial license applications dated July 25, 2022, indicated **WILLIAMS** was the organizer and CEO of TLT2, this AHCCCS application listed **M.T. WILLIAMS's** Social Security Number, XXX-XX-4000, on the AHCCCS application as SSN affiliated with the 100 percent owner of the business. The application,

however, listed **WILLIAMS's** known residential address at that time as well as the **-9552 Number**. Similar to the initial AHCCCS application, the application did not disclose any felony convictions for the owners of TLT2.

40. For the second AHCCCS application, **WILLIAMS** once again provided AHCCCS with the address for **Subject Premises 1**.

41. On or around September 17, 2022, **M.T. WILLIAMS** posted a message and photo on his public-facing Facebook page. **M.T. WILLIAMS's** name was displayed as "Moe Williams" for his Facebook page. Below is a screenshot of the post:



Moe Williams
September 17, 2022 ·

Friends and family I've been gone for some time but I'm back. I need you're guys help with getting my medical clinic out there. A good share and like is all I ask thank you all very much.

TLT
THINKING LEARNING TOGETHER

Thinking
Learning
Together

We are looking to give Native American's who are struggling with homelessness, mental health, and or addiction a safe place to call home while working on living a sober life.

Our program includes free housing, as well as classes and activities specific to the Native American culture to help aid in a enjoyable successful recovery.

If you or someone you know is ready to make the change to living a sober life we are here to help!
Please feel free to call and or email me with any questions or interest in joining our sober living program!

TLT

**Maurice Williams**
**CEO**
Maurice@tltbehavioralhealth.com
602-851-4508

15 3 comments 19 shares

Like Comment Share

View more comments

**WILLIAMS ADMITS OWNERSHIP OF TLT2 DURING BORDER INSPECTION**

42. On November 3, 2024, **WILLIAMS** and Ward were onboard the Norwegian Bliss vessel and arrived in the United States from Mexico at the San Pedro seaport in Los Angeles, California. **WILLIAMS** made voluntary statements during the border inspection to Customs and Border Protection Officers ("CBPOs"). For example, **WILLIAMS** stated that he and Ward have been in a relationship for about 11 years. **WILLIAMS** stated he lived at an address in Peoria (not the SUBJECT PREMISES). **WILLIAMS** advised CBPOs that his phone number was the **-9552 Number**.

43. The inspection conducted by CBPOs revealed there were wads of currency thrown in the bag in a haphazard fashion. CBPOs also observed what appeared to be high-end gold chains and jewelry, as well as high-end brand clothing and bags. CBPOs photographed **WILLIAMS**, and photographed his driver's license, U.S. Passport, and a business card for "Independence Tax Service," which listed **WILLIAMS** as the owner. The phone number for **WILLIAMS** was listed as the **-9552 Number**, and the address as 6744 W. Glendale Ave., Suite 160, Glendale, AZ 85303.

44. During the border inspection, **WILLIAMS** told CBPOs he had multiple businesses, including a mental health clinic under the name of TLT and TLT2. He also stated he owned several tax consulting businesses under the name of Independence Tax Service, located at **Subject Premises 1**. During the inspection, **WILLIAMS** stated he was previously arrested for distribution of marijuana. CBPOs asked **WILLIAMS** how he became so successful, to which he stated he applied his business experience from the distribution of narcotics and applied it to a more legitimate purpose. **WILLIAMS** spoke of his success and appeared to boast when showing CBPOs details of his Wells Fargo Bank account balances on his cell phone. CBPOs detailed they saw that the TLT2 bank account had a balance of over $5,000,000 and another account had a balance of around $1,000,000. When asked about his behavioral/ mental health business, "Thinking Learning Together," **WILLIAMS** stated the funding comes from Arizona's Medicaid program and private payments.

45. During the border inspection, **WILLIAMS** made himself out to be the owner of TLT and TLT2. **WILLIAMS** also declared himself to be the owner of TLT2 on signature cards and account opening documents filed with Bank of America, Wells Fargo Bank, and Wells Fargo Advisors. Additionally, **WILLIAMS** declared himself the owner or member of TLT2 on documents filed with the Arizona Department of Health Services, and social media. However, **WILLIAMS** disclaimed any ownership interest in TLT2 to AHCCCS by making his son, **M.T. WILLIAMS,** the nominee owner on all provider applications filed with AHCCCS.

## AHCCCS ADDITIONAL RISK REVIEW PROCESS EXPLAINED

46. On or around November 14, 2024, investigators spoke with Julie Culton, Deputy Inspector General of AHCCCS-OIG, who informed investigators that failure to disclose a felony conviction is a material omission, and if the AHCCCS Applications had disclosed **WILLIAMS** sustained a felony conviction, that the applications would have undergone an additional risk review process by AHCCCS and could have been denied. Julie Culton provided investigators the following information, detailing how AHCCCS's additional risk review process would have worked if **WILLIAMS** had disclosed his felony conviction on the applications.

47. When an applicant is applying to enroll with AHCCCS using the AHCCCS Provider Enrollment Portal (APEP) and the applicant answers "yes" to the question regarding prior felony convictions, APEP then asks for supplemental information in relation to their conviction.

48. The APEP would then ask the applicant to supply information for each conviction to ensure complete disclosure surrounding the applicant and the conviction. Supplemental information to be disclosed would include: The name of the entity or individual convicted, the applicant, the entity the applicant represents, an individual or entity with an ownership or control interest, an agent or managing employee, any entity in which the applicant has a 5% or more ownership interest, the criminal case number, original charge, convicted charge, name and address of the court where the proceeding took

place, date of the conviction or date plea was entered, identify the penalty imposed as a result of the conviction, whether the entity/individual is on probation. The applicant would also be asked to submit all documents reasonably relevant to an evaluation of the impact of the criminal matter on the applicant's enrollment, including but not limited to conviction papers, probation papers, and probation status report.

49. Then a second level review of the application is triggered after a provider discloses criminal history. A second level review is also triggered when criminal history is discovered by electronic checks conducted by AHCCCS enrollment system, or both. The APEP system uses LexisNexis to search available public records for criminal history for any person or entity disclosed on the provider application.

50. In the year 2022, when **WILLIAMS** submitted both TLT2 applications to AHCCCS, the triggering of a second level review would route the applications to be reviewed by a panel of reviewers consisting of the AHCCCS Provider Enrollment Agent, Provider Enrollment Administrator, Chief Medical Officer, and AHCCCS Inspector General (IG). The IG would also include AHCCCS's Office of General Counsel (OGC) to discuss before making a decision. The second level review process participants would communicate through email, phone calls, or meetings, depending on the circumstances, and AHCCCS would have created documentation to support the decision made.

51. Assuming **WILLIAMS** would have been honest about disclosing his felony convictions, AHCCCS-OIG Deputy Inspector Julie Culton advised investigators that AHCCCS would have escalated both of **WILLIAMS's** AHCCCS applications for second level review of criminal history. Julie Culton also advised investigators that if **WILLIAMS** truthfully disclosed his felony convictions and the $2.1 million outstanding money judgement owed to the State of Arizona, which were owed as fines related to **WILLIAMS's** felony conviction, that the TLT2 applications would have likely been denied as a result of the second level review process. Julie Culton further advised that the application would have likely been denied particularly due to the fact that 22 years after the conviction, **WILLIAMS** still had the $2.1 million outstanding as restitution owed to the State of Arizona.

52. Ms. Culton further advised that if TLT2's AHCCCS applications were approved as part of the second level review process, that at the very least they would have been referred by the IG to OIG, as well as possibly to AHCCCS's claims division to monitor the medical claims submissions, affording AHCCCS the opportunity to detect false claims.

## AHCCCS CHIEF MEDICAL OFFICER REVIEW OF CLAIMS

53. Investigators obtained an opinion from AHCCCS Chief Medical Officer Theresa Costales M.D., who reviewed the claims submitted by TLT2 to AHCCCS. In a letter dated March 21, 2025, Theresa Costales, Chief Medical Officer for AHCCCS, reported that she had the opportunity to review claims data and clinical documentation related to behavioral health services billed by TLT2. The Chief Medical Officer reported that her review revealed numerous instances of billing that support a Credible Allegation of Fraud (CAF) Suspension and consisted of the following:

a. Billing for services that were not supported by the corresponding clinical documentation, all of which exhibited indications of being cloned, including:

   i. Billing for an Alcohol/Drug Assessment with sole supporting documentation consisting of the results of a Breathalyzer exam.

   ii. Billing for Case Management services with sole supporting documentation consisting of asking the member a "check-in question" unrelated to the member's documented treatment plan.

   iii. Billing for Case Management services with sole supporting documentation consisting of arranging transportation without any description of what that transportation consisted of.

   iv. Billing for Intensive Outpatient Program (IOP) Group Counseling with supporting documentation consisting of jumbles of sentences utilizing industry jargon that, when read through a clinical lens, are nonsensical, do not support the number of IOP hours billed, and frequently are unrelated to the member's Treatment Plan.

v. Justifying clinical services with shallow Behavioral Health Assessments and Treatment Plans containing few details about the individual member and failing to describe symptoms and goals supporting the need for IOP services.

b. Billing for services allegedly provided to members in the TLT2 Office who were hospitalized at the time.

c. Billing for services allegedly provided to members in the TLT2 Office who were receiving other medical and/or behavioral health services for acute conditions in facilities upwards of 5 hours away from Phoenix at the time.

d. Billing for services allegedly provided to members in the TLT2 Office and in other places of service on the same day.

e. Billing for services allegedly provided to members for at least 3 hours daily each day of the week (excluding Sundays) for extended periods of time, which is a highly unlikely attendance pattern for anyone, particularly for members requiring an IOP level of services for their mental health and/or substance use disorders.

f. Billing for services allegedly provided to members in the TLT2 Office who were incarcerated at the time.

**REVIEW OF CLAIMS SUBMITTED CONFIRM**
**CHIEF MEDICAL OFFICER'S FINDINGS**

54. Investigators reviewed medical claim records maintained by AHCCCS for behavioral health services provided and submitted by TLT2's assigned, unique AHCCCS provider IDs 124406 and 155341, covering the period between approximately January 1, 2022, and December 31, 2023. During this time, TLT2 (ID: 124406) submitted a total of 4,215 claims for 118 separate members, resulting in AHCCCS paying TLT2 approximately $2,518,834.17; and TLT2 (ID: 155341) submitted a total of 13,493 claims for 246 separate members, resulting in AHCCCS paying TLT2 approximately $17,217,134.57; indicating

that collectively a grand total of 17,708 claims were filed by these two TLT2 entities, resulting in AHCCSS paying a grand total of approximately $19,735,968.74 to TLT2.

55. Based upon the medical records, it appears that all of the AHCCCS beneficiaries for which TLT2 billed were members of the AHCCCS American Indian Health Plan ("AIHP"). Ms. Culton informed investigators that AIHP is a fee-for-service plan administered by AHCCCS, where AHCCCS pays AIHP providers directly for medical services rendered and does not perform a pre-payment review of the medical records before paying the medical provider for services rendered for AIHP members. According to Ms. Culton, AIHP has less upfront oversight that does not include any pre-payment review of a patient's medical records before sending payment and is set up in this manner to facilitate efficient medical care for the American Indian population within Arizona. Based upon my review of records and discussion with AHCCCS, it appears that TLT2 claims targeted AIHP members because AHCCCS paid TLT2's claims more quickly and with no upfront scrutiny involving a pre-payment review of medical records than if the claims had been for non-AIHP beneficiaries.

56. The lack of any pre-approval requirements or pre-payment review, and direct payments from AHCCCS make AIHP different from the other healthcare plans overseen by AHCCCS, which are managed care organizations (MCO) such as Blue Cross Blue Shield, Mercy Care, United Healthcare, and others, that have a pre-pay review process that is completed before a payment is sent to the provider and frequently require a review of medical records before a payment is sent to the medical provider. Managed care organizations also employ a team of employees to perform pre-payment reviews and use data mining techniques to identify fraudulent billing activity upfront, while the AIHP does not have a pre-payment review process in place.

57. A review of claims submitted by TLT2 to AHCCCS, revealed that all the beneficiaries for whom claims submitted were beneficiaries who had the AIHP plan that had no pre-payment review of medical records before paying the medical provider. Investigators learned that 77 AHCCCS beneficiaries who previously had health insurance

coverage under an MCO managed by AHCCCS, were switched to the AIHP during the period June 10, 2022, through March 29, 2023. The 77 members who were switched to AIHP were previously covered under MCO plans administered by United Healthcare, Care 1st Arizona, Banner University Family Care, Mercy Care Plan Arizona Complete Health Care, Steward Health Choice Arizona, and Magellan Complete Care, all plans that would have conducted pre-payment review of claims before the medical provider is paid.

58. Investigators reviewed claims submitted by TLT2 and were able to confirm many examples of false claims as described in the above-mentioned report given by AHCCCS's Chief Medical Officer, Theresa Costales MD, with examples described below where members were hospitalized elsewhere when TLT2 billed for counseling services provided.

59. Patient E.T. assigned AHCCCS beneficiary number A00112949 was hospitalized in Banner Hospital between approximately January 8, 2023, and January 12, 2023, for sepsis and cellulitis. After E.T. was released from the hospital on January 12, 2023, she was admitted to Tempe Post Acute, a post-acute facility to complete treatment for cellulitis, until she was released on or about January 13, 2023. During E.T.'s hospitalization, TLT2 billed AHCCCS for outpatient behavioral health services performed on the dates of January 9, January 12, and January 13, 2023.

60. Patient A.J. assigned AHCCCS beneficiary number A00174288 was hospitalized in Verde Valley Medical Center between approximately March 8, 2023, and March 15, 2023, for treatment of cervicalgia. During A.J.'s hospitalization, TLT2 billed for behavioral health services performed each day during the period between March 8 and March 15, 2023. A.J. was hospitalized in Verde Valley Medical Center, in Cottonwood Arizona, which is nearly a two-hour drive by car from TLT2's offices in Phoenix.

61. Patient A.J. assigned AHCCCS member number A00174288 was again hospitalized in Verde Valley Medical Center, this time between approximately April 4, 2023, and April 19, 2023, for treatment of cervicalgia. During this period of A.J.'s hospitalization, TLT2 billed for behavioral health services performed daily during the

period between April 4 and April 19, 2023. As before, A.J. was hospitalized in Verde Valley Medical Center in Cottonwood.

62. Patient H.P. assigned AHCCCS beneficiary number A00155755 was hospitalized in Banner Estrella Medical Center for treatment of sepsis during the period between approximately October 31, 2022, and November 1, 2022. During this period of H.P.'s hospitalization, TLT2 billed for behavioral health services performed on October 31, 2022.

## EVIDENCE ESTABLISHES WILLIAMS WAS THE TRUE OWNER OF TLT2

### THE -9552 PHONE NUMBER IS SUBSCRIBED TO WILLIAMS

63. As indicated above, the TLT2 AHCCCS Provider Enrollment Applications listed **WILLIAMS's** contact as the **-9552 Number** associated with TLT2. Investigators reviewed subscriber records subpoenaed from the cell phone carriers T-Mobile and AT&T. These records indicate that since in or around February 2012, Integrity Accounting and Tax Service became the subscriber of record for the **-9552 Number**, and a search of incorporation records indicate **WILLIAMS** was directly associated to that business (Integrity Tax and Accounting Service). Additionally, **WILLIAMS** is also directly associated with Independence Tax Service, which is the current business associated with the **-9552 Number**, when it was ported to AT&T. As previously mentioned in this affidavit, during a November 3, 2024 border inspection, **WILLIAMS** himself declared to Customs and Border Protection Officers that he owned Independence Tax Service. Officers found the following business card in his possession, which displayed the **-9552 Number**:




**<u>WILLIAMS CONTROLLED TLT2 BANK ACCOUNTS</u>**

64. On or about March 7, 2022, the Arizona Corporation Commission received an application from **WILLIAMS** to incorporate "Thinking Learning Together 2 LLC", in the State of Arizona. Records maintained by the Arizona Corporation Commission indicate **WILLIAMS** was the Member and Organizer of TLT2, and his email address was the Williams Email.

65. On or about April 7, 2022, **WILLIAMS** opened a checking account at Bank of America in the name "Thinking Learning Together 2 LLC," which ended in 4894 (the "-4894 Account"). The records provided by Bank of America reveal the -4894 Account signature card was signed by **WILLIAMS** and his title on the card was listed as "Member." In addition, the signature card signed by **WILLIAMS** indicates that Thinking Learning Together 2 LLC's legal designation was an Individual Owner/Sole Proprietor/Single Member LLC. The account signature card indicates the -4894 Account was opened at a Bank of America branch located in Peoria, Arizona.

66. Based upon the review of bank records received for the -4894 Account, it appears that **WILLIAMS** signed all checks written on behalf of this account. In addition, **WILLIAMS** appears to be the individual who primarily benefitted from the proceeds deposited into the -4894 Account. The analysis of this checking account indicates that **WILLIAMS** deposited $19,719,191 of the healthcare fraud proceeds received from AHCCCS into the -4894 Account.

## WILLIAMS DEPOSITS FRAUD PROCEEDS INTO THE -4894 ACCOUNT

67. Investigators conducted a review of deposits made into the **WILLIAMS** checking account known as the -4894 Account. Over 98% of the inflows into **WILLIAMS's** -4894 Account were funds received from AHCCCS. For the period between August 1, 2022, and July 13, 2023, forty-six separate checks made payable to TLT2 from AHCCCS were deposited into the account. All AHCCCS checks were sent to TLT2 via the United States Postal Service to **Subject Premises 1**. The cumulative total of these checks made out to TLT2 was $19,719,191.98, and are summarized in the table below:

| Date | Check Number | Payor | Check Amount |
|---|---|---|---|
| 8/1/2022 | 557162 | STATE OF ARIZONA-AHCCCS | $ 23,108.31 |
| 8/1/2022 | 551963 | STATE OF ARIZONA-AHCCCS | $ 5,212.39 |
| 8/11/2022 | 568718 | STATE OF ARIZONA-AHCCCS | $ 41,087.80 |
| 8/11/2022 | 562909 | STATE OF ARIZONA-AHCCCS | $ 31,981.59 |
| 8/18/2022 | 576507 | STATE OF ARIZONA-AHCCCS | $ 95,217.03 |
| 9/6/2022 | 589323 | STATE OF ARIZONA-AHCCCS | $ 57,777.02 |
| 9/6/2022 | 583193 | STATE OF ARIZONA-AHCCCS | $ 7,980.50 |

| Date | Check Number | Payor | Check Amount |
|---|---|---|---|
| 9/6/2022 | 596173 | STATE OF ARIZONA-AHCCCS | $ 1,381.26 |
| 10/4/2022 | 616211 | STATE OF ARIZONA-AHCCCS | $ 29,681.96 |
| 10/4/2022 | 622885 | STATE OF ARIZONA-AHCCCS | $ 636,346.91 |
| 10/17/2022 | 632625 | STATE OF ARIZONA-AHCCCS | $ 718,816.96 |
| 10/18/2022 | 637745 | STATE OF ARIZONA-AHCCCS | $ 328,991.19 |
| 10/24/2022 | 643196 | STATE OF ARIZONA-AHCCCS | $ 330,370.44 |
| 11/2/2022 | 649391 | STATE OF ARIZONA-AHCCCS | $ 337,037.68 |
| 11/16/2022 | 662906 | STATE OF ARIZONA-AHCCCS | $ 349,518.97 |
| 11/16/2022 | 655136 | STATE OF ARIZONA-AHCCCS | $ 355,319.60 |
| 12/28/2022 | 674673 | STATE OF ARIZONA-AHCCCS | $ 394,464.48 |
| 12/28/2022 | 668128 | STATE OF ARIZONA-AHCCCS | $ 365,646.44 |
| 1/25/2023 | 700561 | STATE OF ARIZONA-AHCCCS | $ 363,632.32 |
| 1/25/2023 | 687202 | STATE OF ARIZONA-AHCCCS | $ 273,804.88 |
| 1/25/2023 | 679803 | STATE OF ARIZONA-AHCCCS | $ 395,972.32 |
| 2/13/2023 | 729526 | STATE OF ARIZONA-AHCCCS | $ 390,380.96 |
| 2/13/2023 | 710670 | STATE OF ARIZONA-AHCCCS | $ 397,909.40 |
| 2/13/2023 | 706117 | STATE OF ARIZONA-AHCCCS | $ 619,830.94 |
| 2/13/2023 | 693883 | STATE OF ARIZONA-AHCCCS | $ 489,965.64 |
| 3/8/2023 | 724646 | STATE OF ARIZONA-AHCCCS | $ 451,035.36 |

| Date | Check Number | Payor | Check Amount |
|---|---|---|---|
| 3/8/2023 | 717365 | STATE OF ARIZONA-AHCCCS | $ 561,376.20 |
| 4/17/2023 | 762551 | STATE OF ARIZONA-AHCCCS | $ 525,453.60 |
| 4/17/2023 | 750570 | STATE OF ARIZONA-AHCCCS | $ 893,458.40 |
| 4/17/2023 | 743983 | STATE OF ARIZONA-AHCCCS | $ 495,559.68 |
| 4/17/2023 | 735716 | STATE OF ARIZONA-AHCCCS | $ 407,804.32 |
| 6/6/2023 | 813769 | STATE OF ARIZONA-AHCCCS | $ 513,644.15 |
| 6/6/2023 | 790891 | STATE OF ARIZONA-AHCCCS | $ 1,342,605.59 |
| 6/6/2023 | 784310 | STATE OF ARIZONA-AHCCCS | $ 751,726.56 |
| 6/6/2023 | 779670 | STATE OF ARIZONA-AHCCCS | $ 557,504.64 |
| 6/6/2023 | 770691 | STATE OF ARIZONA-AHCCCS | $ 729,181.45 |
| 6/15/2023 | 842095 | STATE OF ARIZONA-AHCCCS | $ 757,103.28 |
| 6/15/2023 | 818731 | STATE OF ARIZONA-AHCCCS | $ 428,667.28 |
| 6/15/2023 | 813579 | STATE OF ARIZONA-AHCCCS | $ 537,194.19 |
| 6/15/2023 | 808799 | STATE OF ARIZONA-AHCCCS | $ 431,033.68 |
| 6/15/2023 | 803739 | STATE OF ARIZONA-AHCCCS | $ 912,434.83 |
| 7/13/2023 | 842255 | STATE OF ARIZONA-AHCCCS | $ 953,045.00 |
| 7/13/2023 | 838221 | STATE OF ARIZONA-AHCCCS | $ 236,594.44 |
| 7/13/2023 | 838364 | STATE OF ARIZONA-AHCCCS | $ 807,133.33 |
| 7/13/2023 | 818908 | STATE OF ARIZONA-AHCCCS | $ 106,446.69 |

| Date | Check Number | Payor | Check Amount |
|---|---|---|---|
| 7/13/2023 | 808618 | STATE OF ARIZONA-AHCCCS | $ 278,752.32 |
| | | **TOTAL** | **$ 19,719,191.98** |

**WILLIAMS SPENDS LAVISHLY WITH FRAUD PROCEEDS DEPOSITED INTO THE -4894 ACCOUNT**

68. Investigators conducted an analysis of the flow of cash and other funds through the **WILLIAMS** -4894 Account at Bank of America. **WILLIAMS** used the funds to buy two real properties located in Maricopa County Arizona, fund a $1.8 million Certificate of Deposit, purchase a luxury automobile, and spend lavishly on his American Express and Bank of America credit cards, which he often made payments towards the balances with funds from the -4894 Account. What **WILLIAMS** did not spend, he saved, with over $6 million transferred into two brokerage accounts that he opened at Wells Fargo Advisors.

69. In between March 2023 and April 2023, the evidence proves that **WILLIAMS** purchased at least two separate real properties using the funds deposited by AHCCCS. The properties are described further below.

**7979 WEST EXPEDITION WAY, PEORIA, ARIZONA**

70. Investigators examined records subpoenaed from Arizona Brokers Title Agency, indicating **WILLIAMS** signed a purchase contract on or about March 16, 2023, to purchase a single-family residence (**Subject Premises 2**), for a purchase price of $5,250,000. Bank of America records indicate that on or about March 17, 2023, **WILLIAMS** sent a wire transfer from the -4894 Account in the amount of $250,000, to Arizona Brokers Title Agency, as an earnest deposit for the purchase of **Subject Premises 2**. Investigators examined records from the Maricopa County Assessor's website that indicate this residence contains 12,016 square feet of living area and is situated on a large lot on nearly two and a half acres. Below is an overhead view of the property as advertised on the Zillow website:




71. On or about April 21, 2023, **WILLIAMS** sent an additional wire transfer from the -4894 Account in the amount of $4,953,853.98 to Arizona Brokers Title Agency, for the remaining balance of the purchase price. As of the date of this affidavit, **WILLIAMS** is recorded as the property's owner.

**18032 WEST NORTH LANE, WADDELL, ARIZONA**

72. On or about, March 30, 2023, **WILLIAMS** sent a wire transfer from the -4894 Account in the amount of $287,657.75, to Driggs Title Agency. **WILLIAMS** represented these funds as a gift, and provided the funds as an earnest deposit to apparently assist his son, **M.T. WILLIAMS**, purchase a single-family home located at 18032 West North Lane, Waddell, Arizona (the "Waddell House").

73. Investigators have reviewed records from Driggs Title Agency and Home Point Financial Corporation, which show **M.T. WILLIAMS** obtained a mortgage from Home Point Financial Corporation in the amount of $732,856 to fund the remaining

balance of the $1,000,000 purchase price of the Waddell House. On or about March 28, 2023, **M.T. WILLIAMS** completed a Uniform Residential Loan Application, requesting approval for a $732,856 mortgage to fund the remaining purchase price of the Waddell House. On this application, **M.T. WILLIAMS** reported that his total gross monthly income to be $14,903 from his employment as a General Manager at Independence Tax Service, a position he reported holding since February 15, 2018, until the present date of this mortgage application. **M.T. WILLIAMS** reported no other employment or income on the application other than income earned from employment as General Manager at Independent Tax Service. Investigators reviewed wage report records from the Arizona Department of Economic Security indicating **M.T. WILLIAMS** had no wages earned as a General Manager for Independence Tax Service. Wage records maintained by Arizona Department of Economic Security indicate **M.T. WILLIAMS** had nearly no earned wages reported between January 1, 2000, and December 31, 2024. During the fourth quarter of 2023, only $350 in wages were reportedly earned by **M.T. WILLIAMS** from employment at a business named Extreme Reach Talent Inc.

74. The loan application indicated the Waddell House was to be occupied as **M.T. WILLIAMS's** primary residence and his contact information was cell phone ending in -7191 and an email as mauricewilliams1996@XXXXXX.com (the "M.T. Williams Email"). On or about March 27, 2023, **WILLIAMS** provided Home Point Financial a letter stating that he was **M.T. WILLIAMS's** father, and the $287,657 was a gift funded from his -4894 Account. **WILLAMS** provided his contact as the **-9552 Number**. The application made no mention that **M.T. WILLIAMS** was employed by TLT2 or received any compensation from TLT2.

**WILLIAMS MADE PAYMENTS TO NOMINEE OWNER**

75. Between on or about October 17, 2022, and November 14, 2023, investigators found evidence indicating **WILLIAMS** paid his son, **M.T. WILLIAMS** –

the nominee owner of TLT2 – a total amount of around $1,231,750. **WILLIAMS** appears to have paid this amount to **M.T. WILLIAMS** using AHCCCS funds deposited into the Bank of America -4894 Account, by periodically making 29 separate checks payable to his son. From the Bank of America -4894 Account, **WILLIAMS** issued handwritten checks payable to "Maurice Williams," that were then deposited into a personal Bank of America checking account belonging to **M.T. WILLIAMS**. Below is a summary of the payments **WILLIAMS** made to his son, **M.T. WILLIAMS**, which totaled $1,231,750:

| Date | Check Number | Category | Debit Amount | Memo |
|---|---|---|---|---|
| 10/17/2022 | 1007 | MAURICE WILLIAMS | $18,000.00 | Payroll |
| 11/2/2022 | 1006 | MAURICE WILLIAMS | $21,300.00 | Payroll |
| 11/14/2022 | 1018 | MAURICE WILLIAMS | $19,500.00 | Payroll |
| 11/18/2022 | 1016 | MAURICE WILLIAMS | $21,000.00 | Payroll |
| 12/5/2022 | 1022 | MAURICE WILLIAMS | $16,400.00 | Payroll |
| 12/13/2022 | 1031 | MAURICE WILLIAMS | $18,600.00 | Payroll |
| 12/20/2022 | 1033 | MAURICE WILLIAMS | $48,600.00 | Payroll up to 12-9 |
| 12/28/2022 | 1039 | MAURICE WILLIAMS | $50,600.00 | Payroll To 12-16 |
| 1/5/2023 | 1036 | MAURICE WILLIAMS | $29,000.00 | PAYROLL 12-19 to 12-23 |
| 1/13/2023 | 1042 | MAURICE WILLIAMS | $31,200.00 | PAYROLL 12-26 to 1-30 |
| 1/20/2023 | 1040 | MAURICE WILLIAMS | $37,500.00 | Payroll 1-2 to 1-6 |
| 1/25/2023 | 1038 | MAURICE WILLIAMS | $38,750.00 | Payroll 1-9 to 1-14 |
| 2/2/2023 | 1045 | MAURICE WILLIAMS | $50,000.00 | Payroll 1-16 to 1-20 |

| Date | Check Number | Category | Debit Amount | Memo |
|---|---|---|---|---|
| 2/14/2023 | 1046 | MAURICE WILLIAMS | $ 50,000.00 | PAY 1-23 to 2-7 |
| 2/21/2023 | 1048 | MAURICE WILLIAMS | $44,250.00 | Payroll 2-6 to 2-10 |
| 2/21/2023 | 1044 | MAURICE WILLIAMS | $ 52,500.00 | Payroll 1-30 to 2-3 |
| 2/28/2023 | 1029 | MAURICE WILLIAMS | $ 44,250.00 | Payroll Feb 13-17 |
| 3/8/2023 | 1051 | MAURICE WILLIAMS | $47,250.00 | PAYROLL 20-24 |
| 3/14/2023 | 1061 | MAURICE WILLIAMS | $41,000.00 | Payroll 2-27 - 3-3 |
| 3/21/2023 | 1059 | MAURICE WILLIAMS | $50,250.00 | PAYROLL - 3-6 to 3-10 |
| 4/5/2023 | 1067 | MAURICE WILLIAMS | $64,250.00 | Payroll 3-20 to 3-24 |
| 4/12/2023 | 1071 | MAURICE WILLIAMS | $73,300.00 | Payroll 3-27 to 3-31 |
| 4/24/2023 | 1091 | MAURICE WILLIAMS | $70,750.00 | Payroll 3-4 to 3-7 |
| 4/28/2023 | 1082 | MAURICE WILLIAMS | $84,000.00 | Payroll 3-10 to 3-14 |
| 5/4/2023 | 1078 | MAURICE WILLIAMS | $60,250.00 | Payroll 3-17 to 3-21 |
| 6/2/2023 | 1092 | MAURICE WILLIAMS | $55,250.00 | Payroll |
| 7/17/2023 | 1096 | MAURICE WILLIAMS | $ 29,000.00 | Payroll |
| 10/18/2023 | 1103 | MAURICE WILLIAMS | $15,000.00 | |
| 11/14/2023 | 1107 | MAURICE WILLIAMS | $50,000.00 | |
| | | **Total** | **$ 1,231,750.00** | |

## WILLIAMS USED FUNDS TO PURCHASE LUXURY VEHICLE

76. On December 27, 2022, **WILLIAMS** wrote a check (check number 1032), payable to Luxury Auto Collection in the amount of $100,000. The check was drawn on the Bank of America -4894 Account. Evidence indicates these funds were used to fund the purchase of a gray-colored 2022 Rolls Royce Cullinan (Black Badge), VIN# SLATV8C03NU210379, Arizona license plate number AZA82M. State of Arizona Department of Motor Vehicle records indicate that this vehicle was registered to **WILLIAMS** on or about January 2, 2023. State of Arizona Department of Motor Vehicle records also indicate that the prior owner of this vehicle was Luxury Auto Collection LLC. As of this writing, the vehicle is still registered to **WILLIAMS**.

## WILLIAMS PURCHASED A CERTIFICATE OF DEPOSIT

77. On June 9, 2023, **WILLIAMS** appears to have withdrawn $1,800,000 from the TLT2 Bank of America -4894 Account and used these funds to purchase a $1,800,000 Certificate of Deposit at Bank of America. The Certificate of Deposit was assigned account number -6811 and registered to **WILLIAMS**.

## LAVISH SPENDING ON AMERICAN EXPRESS CREDIT CARD

78. On or about January 17, 2023, **WILLIAMS** applied for an American Express Platinum Credit Card. In his application, he provided his date of birth, Social Security number, and an annual income as $2,000,000. **WILLIAMS** also reported his email contact to be the Williams Email. American Express approved **WILLIAMS's** application and issued **WILLIAMS** American Express Platinum Card number ending in -31005 (the "AmEx -31005 Account"). Upon approval, **WILLIAMS** immediately began to use the AmEx -31005 Account to spend lavishly. Between on or about January 17, 2023, and April 8, 2024, **WILLIAMS** used this account to spend on luxury retailers, air travel, hotels, cruises, and jewelry. **WILLIAMS** used the AmEx -31005 Account to spend $116,314 at Louis Voitton, $27,322 at Gucci, $5,722 at Neiman Marcus, and $5,000 at Capri Jewelers.

**WILLIAMS** also used this account to purchase $12,542 in airfare, $8,670 at hotels and resorts, and $5,076 to go on a Princess cruise.

79. Between January 17, 2023, and April 8, 2024, **WILLIAMS** made periodic payments toward the balance of his AmEx -31005 Account using funds drawn from the -4894 Account.

**LAVISH SPENDING CHARGED ON BANK OF AMERICA CARD -4111**

80. On or about August 12, 2022, **WILLIAMS** applied for a Bank of America business credit card in the name TLT2 when he completed an application on which **WILLIAMS** reported his known date of birth, Social Security number, and TLT2's annual gross revenue in the amount of $3,000,000. On the application, **WILLIAMS** reported that TLT2 was a single member sole proprietorship and reported his phone number as the -**9552 Number**. Bank of America approved **WILLIAMS** application and issued **WILLIAMS** a Bank of America credit card number ending in -4111 (the "BofA -4111 CC Account"). Upon approval, **WILLIAMS** immediately began to use the BofA -4111 CC Account to spend lavishly. Between on or about October 1, 2022, and January 8, 2024, **WILLIAMS** used funds from the TLT2 Bank of America -4894 Account to make a cumulative total of $381,969.22 in payments toward the BofA -4111 CC Account. WILLIAMS used the BofA -4111 CC Account to spend on luxury retailers, restaurants, air travel, hotels, cruises, and jewelry.

81. **WILLIAMS** used the BofA -4111 CC Account to spend $27,093 at Louis Vuitton, $43,503 at Gucci, $10,290 at Mattress Firm; $5,707 at Nike, $5,709 at Nordstrom, $4,934 at the Shoe Palace, $1,650 on a Princess cruise line, $7,464 at Best Buy, and $8,876 on monthly swimming pool service fees.

**WILLIAMS CLOSES THE BANK OF AMERICA -4894 ACCOUNT**

82. In the months of May and June of 2024, **WILLIAMS** engaged in a series of monetary transactions by withdrawing all the remaining funds from the TLT2 Bank of America -4894 Account, depleting all funds in the account, which resulted in the closure

of the Bank of America -4894 Account. **WILLIAMS** used the withdrawn funds to purchase nine separate cashier's checks made payable to Thinking Learning Together LLC. Below is a summary of all the withdrawals and subsequent use of those proceeds used by WILLIAMS to purchase nine cashier's checks with the remaining funds in the Bank of America -4894 Account.

83. On May 22, 2024, **WILLIAMS** withdrew $1,000,000 from his Bank of America -4894 Account and used the proceeds to purchase cashier's check number 3980001745, made payable to Thinking learning Together LLC in the amount of $1,000,000.

84. On May 22, 2024, **WILLIAMS** withdrew $1,000,000 from his Bank of America -4894 Account and used the proceeds to purchase cashier's check number 3980001746, made payable to Thinking Learning Together LLC in the amount of $1,000,000.

85. On May 22, 2024, **WILLIAMS** withdrew $1,000,000 from his Bank of America -4894 Account and used the proceeds to purchase cashier's check number 3980001747, made payable to Thinking Learning Together LLC in the amount of $1,000,000.

86. On May 22, 2024, **WILLIAMS** withdrew $1,000,000 from his Bank of America -4894 Account and used the proceeds to purchase cashier's check number 3980001748, made payable to Thinking Learning Together LLC in the amount of $1,000,000.

87. On May 22, 2024, **WILLIAMS** withdrew $1,000,000 from his Bank of America -4894 Account and used the proceeds to purchase cashier's check number 3980001749, made payable to Thinking Learning Together LLC in the amount of $1,000,000.

88. On June 3, 2024, **WILLIAMS** withdrew $100,000 from his Bank of America -4894 Account and used these funds to purchase cashier's check number

1292028661 in the amount of $100,000 made payable to Thinking Learning Together 2 LLC.

89. On June 3, 2024, **WILLIAMS** withdrew $100,000 from his Bank of America -4894 Account and used the proceeds to purchase cashier's check number 1292028662, made payable to Thinking Learning Together LLC in the amount of $100,000.

90. On June 3, 2024, **WILLIAMS** withdrew $30,000 from his Bank of America -4894 Account and used these funds to purchase cashier's check number 1292028663 in the amount of $30,000 made payable to Thinking Learning Together 2 LLC.

91. On June 3, 2024, **WILLIAMS** withdrew $24,127.11 from his Bank of America -4894 Account and used the proceeds to purchase cashier's check number 1292028665, made payable to Thinking Learning Together LLC in the amount of $24,127.11.

92. **WILLIAMS** retained the nine cashier's checks. Those checks were later deposited into a new business checking account that **WILLIAMS** opened at Wells Fargo Bank in the name of Thinking Learning Together 2 LLC. That Wells Fargo business checking account number ended in -9129 (the "WF -9129 Account"), and is further described in a section below.

## WILLIAMS CLOSES THE BANK OF AMERICA CERTIFICATE OF DEPOSIT

93. On or about June 27, 2024, **WILLIAMS's** Bank of America certificate of deposit number ending in -6811 was redeemed. At the time the certificate of deposit was cashed out, it had grown from its $1,800,000 initial value to an accumulated value of $1,922,607.28. On June 27, 2024, Bank of America made check number 49473812 payable to **WILLIAMS** in the amount of $1,922,607.28, which represented the value of the certificate of deposit when redeemed. **WILLIAMS** held onto this check and eventually deposited it into a Wells Fargo Bank personal checking account in the name of Maurice

Williams. The checking account number ended in -4359 (the "WF -4359 Account"), and is further described in a section below.

## WILLIAMS MOVES FUNDS TO WELLS FARGO BANK

94. On June 3, 2024, as stated above, **WILLIAMS** opened a Wells Fargo Bank business checking account in the name Thinking Learning Together 2 LLC (the WF -9129 Account). When opening the WF -9129 Account, **WILLIAMS** signed a Business Account Application dated June 3, 2024, indicating **WILLIAMS** was the sole signer with access to funds in this account. The application revealed **WILLIAMS** was the sole owner of Thinking Learning Together 2 LLC, which was listed as a behavioral and health business. Information contained on the application indicated **WILLIAMS's** email was the Williams Email, the phone contact was listed as the **-9552 Number**, and his residence was listed as **Subject Premises 2**. Investigators analyzed all funds deposited into the WF -9129 Account and found that the source of all funds initially deposited were the cashier's checks **WILLIAMS** purchased when the TLT2 Bank of America -4894 Account was closed. In addition to those cashier's checks totaling over $5 million, investigators identified approximately $16,500 in deposits from other sources.

95. On June 3, 2024, **WILLIAMS** made his initial deposit into the WF -9129 Account, which was a deposit of $130,000. That deposit consisted of Bank of America cashier's check number 1292028661 in the amount of $100,000 (made payable to Thinking Learning Together 2 LLC), and Bank of America cashier's check number 1292028663 in the amount of $30,000, which was also made payable to Thinking Learning Together 2 LLC.

96. On July 16, 2024, **WILLIAMS** made a deposit in the amount of $5,124,127.11 into the WF -9129 Account. That deposit consisted of seven Bank of America cashier's checks totaling $5,124,127.11. The seven cashier's checks making up this deposit are summarized below:

a. On May 22, 2024, **WILLIAMS** deposited Bank of America cashier's check number 3980001745, made payable to Thinking Learning Together LLC, in the amount of $1,000,000.

b. On May 22, 2024, **WILLIAMS** deposited Bank of America cashier's check number 3980001746, made payable to Thinking Learning Together LLC, in the amount of $1,000,000.

c. On May 22, 2024, **WILLIAMS** deposited Bank of America cashier's check number 3980001747, made payable to Thinking Learning Together LLC, in the amount of $1,000,000.

d. On May 22, 2024, **WILLIAMS** deposited Bank of America cashier's check number 3980001748, made payable to Thinking Learning Together LLC, in the amount of $1,000,000.

e. On May 22, 2024, **WILLIAMS** deposited Bank of America cashier's check number 3980001749, made payable to Thinking Learning Together LLC, in the amount of $1,000,000.

f. On June 3, 2024, **WILLIAMS** deposited Bank of America cashier's check number 1292028662, made payable to Thinking Learning Together LLC, in the amount of $100,000.

g. On June 3, 2024, **WILLIAMS** deposited Bank of America cashier's check number 1292028665, made payable to Thinking Learning Together LLC, in the amount of $24,127.11.

97. On or about July 23, 2024, **WILLIAMS** wrote check number 1234, drawn on the WF -9129 Account, payable to Thinking Learning Together in the amount of $5,000,000. **WILLIAMS** then used those funds to purchase cashier's check number 7305701552, payable to Thinking Learning Together 2 LLC, in the amount of $5,000,000. **WILLIAMS** later deposited those funds into a Wells Fargo Advisors brokerage account, account number ending in -1578 (the "WFA -1578 Account"), opened in the name of

Thinking Learning Together 2 LLC. Account details for the WFA -1578 Account will be further described below.

98. Since on or about March 15, 2018, **WILLIAMS** also maintained a Wells Fargo Bank personal checking account number ending in -4359 (the WF -4359 Account), in the name of Maurice Williams. The WF -4359 Account had little activity or funds in the year 2024. When opening the WF -4359 Account, **WILLIAMS** provided his Social Security number, date of birth, and signed a Customer Account Application dated March 15, 2018, indicating **WILLIAMS** was the sole signer with access to funds in this account. Wells Fargo Bank Records indicate that on June 18, 2024, the WF -4359 Account had a beginning balance of $4,843.25, and the mailing address for this account was **Subject Premises 2**.

99. On or about July 16, 2024, **WILLIAMS** deposited $2,040,235.60 into the WF -4359 Account. The deposit included two checks. The first was Bank of America check number 49473812, dated June 27, 2024, payable to Maurice Williams in the amount of $1,922,607.28. Those funds represented the redemption value of the certificate of deposit, the original source of which was AHCCCS funds. The second was Bank of America check number 49473552, dated June 27, 2024, payable to Maurice M. Williams in the amount of $47,628.32.

**WILLIAMS MOVES FUNDS TO WELLS FARGO ADVISORS (INVESTMENT ACCOUNTS)**

100. On or about July 17, 2024, **WILLIAMS** opened a brokerage account at Wells Fargo Advisors in the name of Thinking Learning Together 2 LLC, TIN# 88-3805146 (the WFA -1578 Account). **WILLIAMS** provided his Social Security number and date of birth, and a signature page dated July 17, 2024, was signed by **WILLIAMS**, acknowledging that he was the member manager of TLT2. On the Limited Liability Company Authorization form signed and dated July 17, 2024, **WILLIAMS** acknowledged that he was TLT2's managing member authorized to transact on behalf of TLT2. On a

Beneficial Owner(s) Information sheet dated July 17, 2024, **WILLIAMS** affirmed that he was the individual owner of TLT2.

101. On or about July 23, 2024, **WILLIAMS** made his initial deposit into the WFA -1578 Account by depositing the aforementioned Wells Fargo Bank cashier's check number 7305701552, which was made payable to Thinking Learning Together 2 LLC in the amount of $5,000,000. Investigators reviewed the WFA -1578 Account and found no other source of deposits made into the account. A Wells Fargo Advisors account statement for the month of April 2026, indicates the account balance as of that date was a cash balance of $5,391,794.

102. On or about July 17, 2024, **WILLIAMS** opened a brokerage account at Wells Fargo Advisors in the name of Maurice Williams, SSN# XXX-XX-4296, account number ending in -9922. (the "WFA -9922 Account"). On the New Account Application form, **WILLIAMS** reported his address as **Subject Premises 2**, his phone number as the **-9552 Number**, and the email address as the Williams Email. Information on the New Account Application also indicated **WILLIAMS** was employed by Thinking Learning Together LLC for the past 13 years, and that his occupation was "Healthcare" and "Technical." A signature page signed by **WILLIAMS** and dated July 17, 2024, reported **WILLIAMS's** Social Security number as XXX-XX-4296.

103. On July 23, 2024, **WILLIAMS** withdrew $1,600,000 in funds from his personal WF -4359 Account and used the funds to purchase cashier's check number 7305701553 in the amount of $1,600,000, made payable to **WILLIAMS**. On July 23, 2024, **WILLIAMS** deposited this $1,600,000 cashier's check into his personal Wells Fargo Advisors brokerage account (the WFA -9922 Account). A Wells Fargo Advisors account statement for the month of April 2026, indicates the account balance as of that date was a cash balance of $151,800.11.

**WILLIAMS CONCEALS CRIMINAL HISTORY AND ASSETS FROM AHCCCS WHILE APPLYING FOR HIS OWN HEALTH INSURANCE COVERAGE PROVIDED BY AHCCCS:**

104. AHCCCS records provided to investigators revealed that on or around June 17, 2022, AHCCCS received a renewal application from **WILLIAMS** requesting AHCCCS continue his own, personal health insurance coverage administered by AHCCCS, which is intended to provide health insurance for low-income residents in the State of Arizona. On a renewal application, **WILLIAMS** provided his contact information, which included the **-9552 Number** and the Williams Email. The renewal application solicited information about criminal history through the following question: "Had a felony conviction for possession, use, or distribution of a controlled substance on or after August 23, 1996"; for this question, **WILLIAMS** answered "NO." The renewal application also asked the following question: "Does anyone have any type of bank account"; and for this question, **WILLIAMS** answered "NO." Investigators have reviewed bank records obtained for **WILLIAMS**, which showed that on April 7, 2022, **WILLIAMS** opened the -4894 Account. Bank of America records revealed that as of June 17, 2022 – the date of his AHCCCS health insurance coverage application in which he indicated he had no bank accounts – the -4894 Account had a balance of $16,631.

105. AHCCCS records provided to investigators revealed that on or around June 16, 2023 – around one year after the previous year's application – AHCCCS received another renewal application from **WILLIAMS**, requesting AHCCCS continue his own personal health insurance coverage administered by AHCCCS. On this renewal application, **WILLIAMS** again placed his contact information as the **-9552 Number** and the Williams Email. **WILLIAMS** again denied having a felony conviction. He also denied having a bank account even though records revealed that as of June 16, 2023 – the date of this AHCCCS health insurance coverage renewal application in which he indicated he had no bank accounts – the -4894 Account had a balance of $5,704,608. The renewal application also asked this question of **WILLIAMS**: "Your household has no income or

your expenses are more than your income, how do you support your household or cover your expenses?" **WILLIAMS** provided the following response: "Living with family-friends." As previously stated, investigators reviewed title company records showing that, in April 2023, approximately two months before **WILLIAMS** submitted this AHCCCS renewal application, **WILLIAMS** purchased **Subject Premises 2**.

## ITEMS TO BE SEIZED FROM PHYSICAL LOCATIONS

106. Investigators seek evidence from the **Subject Premises** and the **-9552 Number** phone for two primary reasons. First, as described above, AHCCCS providers are required to retain medical records related to treatment provided to AHCCCS beneficiaries for six years. To the extent **WILLIAMS** provided any services to AHCCCS beneficiaries, recorded those services in medical notes, and retained those notes pursuant to AHCCCS's requirements, that evidence would be highly probative in the government's investigation. Relatedly, the notes may include names of potential witnesses (beneficiaries or employees) who could provide information regarding any services provided by TLT2. Second, as described above, WILLIAMS asserted in an AHCCCS administrative proceeding that TLT2 was operated by his son, **M.T. WILLIAMS**, rather than **WILLIAMS**. All records related to TLT2, including without limitation financial records or records related to business operations, may be probative in determining the true owner and operator of TLT2. Similarly, records reflecting other large purchases may reveal who controlled the funds paid by AHCCCS to TLT2.

107. Based upon the facts contained in this Affidavit, I submit there is probable cause to believe that the items listed in Attachment B-1 will be found at **Subject Premises 1** and the items listed in Attachment B-2 will be found at **Subject Premises 2**.

108. Based on my training, education, and experience, and discussions with other trained law enforcement personnel, along with information provided by other sources of information, I know the following:

a. Subjects defrauding state health insurance programs often maintain copies of health insurance cards, including lists containing many individuals personally identifiable information for health insurance members to include member identification cards and numbers, dates of birth, and Social Security numbers, used in order to continue to bill and receive the funds. Subjects commonly maintain bank account records, receipts of luxury items purchased, records and files for assets purchased and accumulated with fraud scheme proceeds. Subjects committing such fraud schemes commonly maintain such items in their homes or in their vehicles. In consulting with other law enforcement officers who have worked similar cases in the past, such items have been located more than twelve months after the date of the alleged offense.

b. Subjects conducting such health insurance fraud schemes often maintain paper records of their fraudulent billing activity. I am aware that such records are commonly maintained for long periods of time and therefore are likely to be found at **Subject Premises 1** and **Subject Premises 2.** In consulting with other law enforcement officers who have worked similar cases in the past, they have found these types of documents in the possession of those engaged in such fraud schemes more than 12 months after the last known action in furtherance of the scheme.

c. Subjects conducting such healthcare fraud schemes commonly use computers, cellular telephones, and other electronic devices to communicate with other fraudsters about their activities through the use of telephone calls, text messages, email, chat rooms, social media, and the other internet-and application-based communication forums to obtain and distribute personal identifying information. The subjects committing such fraud schemes also utilize these devices to search members' eligibility for healthcare benefits and communicate with state agencies using computers to submit bills for services rendered and receive the financial benefits. Therefore, evidence related to healthcare fraud is likely to be found on **WILLIAMS's** cellphone – the **-9552 Number** – at **Subject Premises 2**, as further described below.

d. In addition to items which may constitute evidence, fruits and/or instrumentalities of the crimes set forth in this Affidavit, I request permission to seize any articles tending to establish the identity of persons who have dominion and control over **Subject Premises 1** and **Subject Premises 2**, including receipts, utility bills, telephone bills, addressed mail, personal identification, purchase receipts, sale receipts, and photographs.

## DIGITAL EVIDENCE STORED WITHIN ELECTRONIC STORAGE MEDIA AT PHYSICAL LOCATIONS

109. As described in Attachments B-2 and B-3, this application seeks permission to search for records that might be found in or on **Subject Premises 2** and **WILLIAMS.** Specifically, data stored on the cellular assigned with the -9552 Number. Thus, the warrant applied for would authorize the seizure of the cellphone assigned with the -9552 Number on **Subject Premises 2** or **WILLIAMS** and, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

110. *Probable cause.* I submit that if the cellphone assigned with the -9552 Number is found in or on **Subject Premises 2** or **WILLIAMS**, there is probable cause to believe records and information relevant to the criminal violations set forth in this Affidavit will be stored on such media, for at least the following reasons:

a. I am aware that when an individual uses certain electronic storage media, the electronic storage media may serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic storage media is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic storage media is also likely to be a storage medium for evidence of crime. From my training and experience, your Affiant believes that electronic storage media used to commit a crime of this type may contain: data that is evidence of how the electronic storage media was used; data that was sent or received; notes as to how

the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

b. Based on my knowledge, training, and experience, I understand that electronic storage media contain electronically stored data, including, but not limited to, records related to communications made to or from the electronic storage media, such as the associated telephone numbers or account identifiers, the dates and times of the communications, and the content of stored text messages, e-mails, and other communications; names and telephone numbers stored in electronic "address books;" photographs, videos, and audio files; stored dates, appointments, and other information on personal calendars; notes, documents, or text files; information that has been accessed and downloaded from the Internet; and global positioning system ("GPS") information.

c. Based on my knowledge, training, and experience, I understand that electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto an electronic storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on an electronic storage medium, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

d. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the electronic storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

e. As previously set forth in this Affidavit, the targets of this investigation have appeared to use both computers and cellular telephones to communicate with others in connection to this fraud scheme.

111. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronic files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how the electronic storage media were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be found on the cellphone assigned with the -9552 Number, located in or on **Subject Premises 2** or **WILLIAMS** because:

a. Data on a storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. File systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within electronic storage medium (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the storage medium. This

"user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the owner. Further, activity on an electronic storage medium can indicate how and when the storage medium was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on an electronic storage medium may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the existence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera) not previously identified. The geographic and timeline information described herein may either inculpate or exculpate the user of the electronic storage medium. Last, information stored within an electronic storage medium may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information within a computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on an electronic storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, electronic storage medium evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on one electronic storage medium is evidence may depend on other information stored on that or other storage media and the application of knowledge about how electronic storage media behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how an electronic storage medium was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

112. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on electronic storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. *The time required for an examination*. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine electronic storage media to obtain evidence. Electronic storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. *Technical requirements*. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises. However, taking the electronic storage media off-site and reviewing it in a controlled environment allows for a thorough examination with the proper tools and knowledge.

c. *Variety of forms of electronic media*. Records sought under this warrant could be stored in a variety of electronic storage media formats that may require off-site reviewing with specialized forensic tools.

113. *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant your Affiant is applying for would permit seizing, imaging, or otherwise copying electronic storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might

expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

114. The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

115. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

116. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

117. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial

recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

118. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

119. As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

120. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

121. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

122. Due to the foregoing, if law enforcement personnel encounter the device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the subject premises and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## CONCLUSION

123. I respectfully submit there is probable cause to believe that the items listed in Attachments B-1, B-2, and B-3, which constitute evidence, fruits, and/or instrumentalities of violations of the Subject Offenses are likely to be found at **Subject**

**Premises 1** and **Subject Premises 2** including its detached structures with include garages, and **WILLIAMS**.

124. I further respectfully submit that there is probable cause to authorize the seizure of the following property for forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) and (C), and 18 U.S.C. § 982(a)(1) and (7): the **2022 Rolls Royce**, the **WFA -1578 Account**, and the **WFA -9922 Account**. I further respectfully submit that there is probable cause that such property subject to forfeiture is portable and transformable, and that a restraining order under 21 U.S.C. § 853(e) may not be sufficient to assure the property's availability for forfeiture.

Based on the foregoing, I request that the Court issue the proposed search and seizure warrants.

Respectfully submitted,

Digitally signed by JESUS GOODMAN
Date: 2026.09.10 08:40:16 -07'00'

Jesus Goodman, Special Agent
Homeland Security Investigations

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1 on September 10, 2026. @ 2:10 p.m.

Honorable Deborah M. Fine
United States Magistrate Judge